Honorable Kymberly K. Evanson

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL SCOTT LANGTON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BELLINGHAM, a municipal corporation, CHAD CRISTELLI, and DONALD ALMER,<br><br>Defendants. | No. 2:24-cv-01073-KKE<br><br>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT<br><br>Note on Motion Calendar:<br>November 7, 2025 |

//

//



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

## TABLE OF CONTENTS

I. FACTS ... 3

A. Officer Langton asked a woman to watch child pornography with him and to let him "play" with her 12-year-old daughter at a nudist beach. ... 3

B. Prosecutors and a judge agreed there was probable cause ... 7

C. There were valid reasons to promptly arrest Officer Langton. ... 9

D. Due to the potential danger posed by Officer Langton, a decision was made to deploy the SWAT team ... 10

E. Officer Langton was safely arrested by the SWAT team without use of force. ... 13

F. The search of his house revealed that Officer Langton destroyed evidence. ... 15

G. Follow-up investigation ... 16

H. Criminal prosecution ... 17

II. ARGUMENT ... 18

A. The excessive-force claim fails for multiple reasons ... 19

1. No force was used against Mr. Langton. ... 19

2. As a matter of law, any force used was not excessive. ... 21

3. Deputy Chief Almer is entitled to qualified immunity. ... 24

4. There is no evidence supporting municipal liability. ... 24

B. There was no assault. ... 25

1. Police use of reasonable force is not an assault. ... 26

2. There is no evidence supporting the elements of assault. ... 26

C. The false-arrest and false-imprisonment claims fail for multiple reasons. ... 26

1. Mr. Langton's arrest was supported by probable cause. ... 27

2. Lieutenant Cristelli and Deputy Chief Almer have qualified immunity. ... 30

D. The negligent-investigation claim is improper ... 31

III. CONCLUSION ... 31



**SEAMARK LAW GROUP PLLC**
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

The City of Bellingham, retired Deputy Chief of Operations Donald Almer, and retired Lieutenant Chad Cristelli move for summary judgment on all claims against them. This case arises from the arrest of former Ferndale Police Officer Michael Scott Langton for suspected possession of child pornography and attempted rape of a child.[1] Contrary to Plaintiff's allegations, however, there was no excessive force; his arrest was lawful; and negligent investigation is not a valid claim.

## I. FACTS

### A. Officer Langton asked a woman to watch child pornography with him and to let him "play" with her 12-year-old daughter at a nudist beach.

On the afternoon of July 26, 2022, the Whatcom County Sheriff's Office asked the Bellingham Police Department to respond to a woman named Jasmine Harp who had called 911 to report misconduct by a Ferndale police officer. (Decl. of Chad Cristelli ¶¶ 3–4.) Sheriff's Lieutenant Scott Huso explained that he was referring the matter to Bellingham because the Sheriff's Office worked so closely with the Ferndale Police Department. (*Id.* ¶ 3.)

When Bellingham Police Lieutenant Chad Cristelli reviewed the information in the dispatch system, he saw that Ms. Harp's 911 call had come in about two hours earlier, and that she had already phoned again to inquire about the delay. (*Id.* ¶ 4.) Lieutenant Cristelli informed Sergeant Brock Crawford of the situation, who then assigned Detective Taylor Allen to take the report. (*Id.*)

Because Ms. Harp had been waiting so long, Lieutenant Cristelli called to let her

---

[1] Although Plaintiff was charged with Attempted Child Molestation in the 2nd Degree, *see* RCW 9A.28.020 and 9A.44.086, he indicated he wanted to perform oral sex on a 12-year-old, which would have constituted Rape of a Child in the 2nd Degree, *see* RCW 9A.44.010(14)(c) and 9A.44.076.



SEAMARK LAW GROUP PLLC
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

know that a detective would contact her soon. (*Id.* ¶ 5.) Ms. Harp said she was already at the Bellingham police station, so Lieutenant Cristelli went out to the lobby to check on her and apologize for the delay. (*Id.*) Ms. Harp began crying and stated that she needed to report a Ferndale officer's behavior involving young children. (*Id.*) Lieutenant Cristelli gave her a bottle of water and told her that detectives would be with her shortly.[2] (*Id.*)

Detective Allen arrived at the Police Station around 3:30 p.m., listened to the recording of Ms. Harp's 911 call, and then brought Ms. Harp to an interview room to take a recorded statement. (Decl. of Taylor Allen ¶ 4.) Ms. Harp reported that Ferndale Police Officer Michael Scott Langton[3] had disclosed that he was sexually attracted to children, asked her to watch child pornography with him, and asked to have sex with her 12-year-old daughter. (*Id.* ¶ 5.) Ms. Harp showed Detective Allen numerous text messages from Officer Langton that corroborated this. (*Id.*)

Ms. Harp explained that this had started a couple of weeks prior, when Officer Langton had responded to a vehicle collision at her apartment complex. (*Id.* ¶ 6.) The following evening, Officer Langton came by Ms. Harp's apartment while she was away. (*Id.* ¶ 7.) Ms. Harp's 12-year-old daughter answered the door, and Officer Langton spoke

---

[2] Plaintiff contends that Lieutenant Cristelli should have recused himself because the Ferndale Police Department had investigated his son in an unrelated criminal case. But Lieutenant Cristelli had a good working relationship with the Ferndale Police Department, even after two of its detectives investigated his son's case. (Cristelli Decl. ¶ 16.) He did not know Officer Langton and, to his knowledge, Officer Langton was not involved in the investigation of his son. (*Id.*) Lieutenant Cristelli felt that he could be fair and objective, particularly when his role was that of a supervisor. (*Id.*) The City of Bellingham concurs that Lieutenant Cristelli did not have a conflict of interest. (*See* Decl. of Geoff Grindeland Ex. A (Holdridge Dep. Tr.) at 51:10–52:18.)

[3] As Plaintiff was actively serving as a police officer during most of the events described, he is referred to as "Officer Langton" in this Facts section.



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

with her. (*Id.*) Officer Langton then called Ms. Harp and claimed he had forgotten the name of her property management company, but Ms. Harp suspected that was just an excuse to call her. (*Id.*)

After that, Officer Langton and Ms. Harp began calling and texting each other regularly. (*Id.* ¶ 8.) Officer Langton asked Ms. Harp to install an encrypted-messaging app called Signal on her phone, and they began sending messages via Signal. (*Id.*) Officer Langton set the Signal messages to autodelete, but Ms. Harp started taking screenshots of messages once he began referencing his sexual attraction to children. (*Id.*) Ms. Harp told Detective Allen that Officer Langton "is obsessed with the idea of having sex with a 12-year-old." (*Id.*)

About a week into the relationship, Ms. Harp accepted Officer Langton's invitation to visit his house in Blaine. (*Id.* ¶ 9.) She observed that he had "a mountain of ammunition and guns." (*Id.*) He asked her if she wanted to watch "barely legal" porn, which she understood to mean pornography involving young women, but she declined. (*Id.*) He also asked if she would role play as a child and, again, she declined. (*Id.*) Then, while they were having sex that night, Officer Langton whispered in her ear, "Please, please, tell me you'll watch 12-year-old porn." (*Id.*)

Over the next week, Officer Langton repeatedly sent Ms. Harp text messages graphically describing his obsession with child pornography and his desire to have sex with a child. (*Id.* ¶ 10.) Ms. Harp showed Detective Allen screenshots of these messages, including ones Officer Langton had sent the night before (July 25) that read:

- "I want a 12 year old."
- "I like illegal."



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

- “I think about it all the time.”
- “I just like young.”
- "I want to explore young 12 year old girls. Or 11.”
- “I’d like to watch young poo . . . . Porn. With yiu [sic].”
- “Look at naked preteen girls.”
- “I want you to teach a young teen how to please.”
- “I just have always thought about licking a 12 year old pussy out.”
- “I’d love to act on it.”
- “The thought of it turns me on.”
- “I really want to lick & suck her bald pussy.”
- “I want to.”
- “I think about it.”
- “Please.”
- “Just let me lick it.”
- “I want to lick a young.”
- “Please understand.”
- “Will you please play with me.”
- “I want to play with you snd [sic] your daughter, nudist beach.”

(*Id.*)

Ms. Harp told Detective Allen that she understood this last message about “playing” with her daughter to be a proposition to let Officer Langton have sex with her 12-year-old daughter, whom Officer Langton had met when he came to her apartment



**SEAMARK LAW GROUP PLLC**
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

two weeks before. (*Id.* ¶ 11.)

Detective Allen saw another message from Officer Langton to Ms. Harp that read:

- "Can we at least. look at young porn together? I say porn but I guess it's just nude young girls. There's a nudist site called purenudisum [sic]. Is cute."

(*Id.* ¶ 14.) The "purenudism" website contains photos of naked children, aged 10 to 15, in sexual exhibition. (*Id.*)

Ms. Harp told Detective Allen that Officer Langton had "encrypted internet . . . [s]o he can watch whatever kid porn he wants and not get caught." (*Id.* ¶ 13.)

Ms. Harp also reported that Officer Langton drove by her apartment every night that he was on patrol—sometimes several times a night. (*Id.* ¶ 15.) (When Ms. Harp's 12-year-old daughter was interviewed a couple of days later, she said she had seen Officer Langton parked on the street behind their apartment at night, possibly watching their apartment. (*Id.*))

Ms. Harp was a credible witness who was genuinely concerned about Officer Langton's actions and did not seem to have any ulterior motive for reporting him. (*Id.* ¶ 48.) Further, the text messages from Officer Langton corroborated her statements. (*Id.*)

Ms. Harp said she wanted a restraining order, and Detective Allen said detectives could help her get that process started. (*Id.* ¶ 15.) She also expressed concern that he might use his own son as a "shield" if the police came to arrest him. (*Id.* ¶ 51.)

**B. Prosecutors and a judge agreed there was probable cause.**

Based on Ms. Harp's recorded statement and the text messages, Detective Allen believed there was probable cause to arrest Officer Langton for several different felonies. (*Id.* ¶ 17.) To her, the evidence showed that Officer Langton had spent two weeks



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

grooming Ms. Harp to try to persuade her to allow him to rape her 12-year-old daughter and to view child pornography with him. (*Id.*)

Because of the serious nature of the conduct and the fact that the suspect was a police officer, Sergeant Crawford contacted the Whatcom County Prosecuting Attorney's Office for advice. (Cristelli Decl. ¶ 8.) Deputy Prosecuting Attorneys Kellen Kooistra and Benjamin Pratt then came to the police station and met with Detective Allen, Detective Travis Hauri, Sergeant Crawford, and Lieutenant Cristelli to discuss the case. (Allen Decl. ¶ 18.) Detective Allen briefed the group on the facts and her assessment that there was probable cause to arrest Officer Langton. (*Id.*) Mr. Kooistra and Mr. Pratt agreed and suggested that the crimes best fitting the facts appeared to be "solicitation of a minor" and "possession of child pornography." (*Id.*)

Detective Allen understood "solicitation of a minor" to be shorthand for Criminal Solicitation of Rape of a Child in the 2nd Degree (RCW 9A.28.030 & RCW 9A.44.076) or Criminal Solicitation of Child Molestation in the 2nd Degree (RCW 9A.28.030 & RCW 9A.44.086), and she understood "possession of child pornography" to be shorthand for Possession of Depictions of Minor Engaged in Sexually Explicit Conduct (RCW 9.68A.070). (Allen Decl. ¶ 18.)

Mr. Kooistra and Mr. Pratt also agreed that detectives should obtain a search warrant for Officer Langton's home and conduct the search as soon as possible to prevent the destruction of evidence that was likely to occur if Officer Langton learned that Ms. Harp had gone to the police. (*Id.* ¶ 19.)

Lieutenant Cristelli reached out to Deputy Chief Donald Almer to let him know about the investigation and to request a consultation with SWAT. (Cristelli Decl. ¶ 10.)



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Lieutenant Cristelli was concerned that serving a search warrant on a police officer suspected of serious crimes involved a heightened risk, because officers have firearms and special training in police tactics. (*Id.*)

Deputy Chief Almer was briefed on the investigation. (Decl. of Donald Almer ¶ 4.) Based on the nature of the crime, the fact the suspect was a police officer, and that the arrest would be occurring outside city limits, he made a preliminary decision to have the SWAT team assemble at the police station to minimize any delay if he decided to use the team. (*Id.* ¶ 5.)

Once Detective Allen had prepared a statement of facts, she called Mr. Kooistra, and he conferenced in Whatcom County Superior Court Judge Evan Jones. (Allen Decl. ¶ 20.) Detective Allen presented verbal testimony and requested a warrant to search Officer Langton's home and seize his cell phones, computers, and other digital-storage devices. (*Id.*) Judge Jones authorized the warrant, finding there was probable cause for both "solicitation of a minor" and possession of child pornography. (*Id.* ¶ 20 & Ex. C.)

**C. There were valid reasons to promptly arrest Officer Langton.**

Deputy Chief Almer, Lieutenant Cristelli, Sergeant Crawford, and Detectives Allen and Hauri also discussed the plan for executing the search warrant and arresting Officer Langton. (Allen Decl. ¶ 21.) They all agreed that a custodial arrest (taking Officer Langton to jail) would be safest for Ms. Harp and her daughter. (*Id.*) That a police officer had behaved in such a shocking manner led them to believe Officer Langton was unpredictable and potentially dangerous. (*Id.*) They anticipated he would be upset to learn that he had been caught, because his career was probably over and he faced potential jail time. (*Id.*) An arrest would allow Officer Langton to cool down and time for Ms. Harp



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

to seek a protective order and arrange for her family's safety. (*Id.*)

Additionally, arresting Officer Langton would help protect the integrity of the investigation. (*Id.* ¶ 52.) Officer Langton was still texting Ms. Harp while she was at the police station. (*Id.*) If he became suspicious because she stopped responding to his texts, or if he learned some other way that she had gone to the police, he might destroy evidence or attempt to contact witnesses. (*Id.*)

**D. Due to the potential danger posed by Officer Langton, a decision was made to deploy the SWAT team.**

Any time a search warrant is to be executed, departmental policy is to complete an agency threat-assessment form. (Almer Decl. ¶ 6.) This form is intended to guide officers as to whether they should consult with the SWAT team before serving the warrant. (*Id.*) The ultimate decision whether to use the SWAT team, however, is made on a case-by-case basis. (*Id.*)

In this case, the agency threat-assessment form Officer Corbin Puhan completed noted the following risk factors:

- Suspect had a "military/police background;"
- The offense being investigated was a felony;
- Suspect was known to possess a rifle;
- Suspect was known to possess a handgun;
- Suspect was believed to carry a knife on his person;
- It was believed a child would be present; and
- There was limited time available for planning.

(*Id.* ¶ 7 & Ex. A.) These factors resulted in a threat-assessment score of 16, which is at



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

the top end of the range when consultation with the SWAT team is recommended rather than required. (Almer Decl. ¶ 7.)

After considering all available information, Deputy Chief Almer decided it was appropriate to use the SWAT team. (*Id.* ¶ 8.) He based this decision on the totality of circumstances, including the factors listed in the threat-assessment form and the following additional considerations:

- The type of crime for which Officer Langton was being arrested was likely career-ending and has extraordinary social stigma.[4] Sometimes people accused of these types of crimes become suicidal or choose to resist arrest.
- Officer Langton was familiar with police tactics, techniques, and capabilities, making him more dangerous if he chose to resist.
- Officer Langton had a reputation as a "prepper," which made it more likely that he had installed security cameras or taken other measures to bolster his home defenses. This made him potentially more dangerous if he chose to resist.
- Officer Langton possessed multiple firearms, including rifles, and a stockpile of ammunition.
- It had been publicly reported that Officer Langton had been investigated for potential ties to the "Oath Keeper" movement, which if true, could indicate that he held anti-government opinions and might be more likely to resist arrest.
- Officer Langton often drank while off duty. If he was intoxicated, that might

[4] In fact, Mr. Langton was subsequently fired by the Ferndale Police Department due to an order entered in the criminal case that prohibited him from carrying firearms or being around children. After the criminal charge was dropped, the Ferndale Police Department completed an internal investigation that found Mr. Langton had violated numerous policies. The Ferndale Police Chief concluded that, if he had not already been fired, "the serious and egregious nature of these policy violations would have supported termination of Langton's employment." (*See* Grindeland Decl. Ex. B (Langton Dep Tr.) at 124:25–126:12.) The Washington State Criminal Justice Training Commission has also revoked Mr. Langton's peace-officer certification. (*See id.* at 26:20–27:4.)



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

inhibit his judgment and make him more likely to resist arrest.

- The arrest would occur in Blaine, 20 miles outside of Bellingham, and the Blaine Police Department is very small. This meant neither Blaine nor Bellingham patrol officers would be available for immediate backup if needed.

(*Id.*)

It was Deputy Chief Almer's professional judgment that use of the SWAT team would be safer for Officer Langton, his son, other members of the public, and arresting officers. (*Id.* ¶ 10.) If Officer Langton barricaded himself inside his home or resisted arrest in some other manner, the SWAT team had the tools, training, and personnel to reduce the risk to everyone. (*Id.*)

In consultation with the Investigations Division, the SWAT team, and the Ferndale Police Department leadership, a three-step plan to secure Officer Langton's peaceful arrest was developed. (*Id.* ¶ 11.) First, supervisors from the Ferndale Police Department would call Officer Langton and order him to report to the Ferndale Police Station so that he could be arrested there, away from his son and weapons. (*Id.*) If that failed, crisis negotiators would telephone Officer Langton and try to persuade him to surrender. (*Id.*) If that also failed, the SWAT team would conduct a surround and callout. (*Id.*)

A surround and callout means to surround a house, announce the police presence, and instruct the suspect to exit the house and surrender. (*Id.* ¶ 12.) This is often safer for everyone—including the suspect—than having the SWAT team enter the suspect's house to make the arrest. (*Id.*)

Because Detective Allen was concerned for the safety of Ms. Harp and her children, she suggested that they not go home until Officer Langton was in custody. (Allen



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Decl. ¶ 22.) Ms. Harp agreed. (*Id.*)

### E. Officer Langton was safely arrested by the SWAT team without use of force.

After everyone was briefed on the plan, Deputy Chief Almer and the SWAT team traveled to a staging area near Officer Langton's residence in Blaine, while Lieutenant Cristelli and Detectives Allen and Hauri went to the Ferndale Police Department. (Allen Decl. ¶ 24; Almer Decl. ¶ 13; Cristelli Decl. ¶ 14.)

Officers used drones equipped with cameras to observe Officer Langton's house, and Deputy Chief Almer was able to watch a live feed of the video. (Almer Decl. ¶ 14.)

Around 9:30 p.m., Ferndale Lieutenant VanderYacht called Officer Langton, informed him that he was under criminal investigation by the Bellingham Police Department, and asked him to come pick up papers placing him on administrative leave. (Allen Decl. ¶ 24; Cristelli Decl. ¶ 14.) Officer Langton said he would not be coming to the station because he had been drinking. (Allen Decl. ¶ 24; Cristelli Decl. ¶ 14.) He asked what the criminal investigation was about, but Lieutenant VanderYacht declined to answer. (Cristelli Decl. ¶ 14.)

Around 9:38 p.m., Lieutenant Cristelli informed Deputy Chief Almer that the call to Officer Langton was not going well. (Almer Decl. ¶ 17.) Around the same time, the drone video showed Officer Langton opening his front door and looking outside. (*Id.*) This appeared to be a "heat check," meaning an attempt to see if there was a police presence. (*Id.*)

Around 9:40 p.m., Lieutenant Cristelli let Deputy Chief Almer know that Officer Langton had refused to report to the station and had been drinking. (*Id.* ¶ 19.) Shortly



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

after the call from Lieutenant VanderYacht ended, Officer Langton lit a fire in his backyard and officers watching the back of the house saw him burning what appeared to be documents in it. (*Id.* ¶ 20.) Deputy Chief Almer inferred that Officer Langton was destroying evidence after learning that he was under investigation. (*Id.*) Although officers did not need any further justification to arrest Officer Langton, Deputy Chief Almer believed these actions created probable cause to believe he was committing another crime (Tampering with Physical Evidence, RCW 9A.72.150). (Almer Decl. ¶ 20.)

Crisis negotiators then called and texted Officer Langton several times on both his work and personal cellphones, but he did not respond. (*Id.* ¶ 21.) The Ferndale Police Department tried calling again, but Officer Langton did not answer them, either. (*Id.* ¶ 22.)

Deputy Chief Almer concluded that all reasonable alternatives had been exhausted and that officers needed to act to prevent further destruction of evidence. (*Id.* ¶ 23.) Around 9:49 p.m., he directed the SWAT team to proceed with calling Officer Langton out of his home. (*Id.*)

The SWAT team's Bearcat vehicle (an unarmed rescue vehicle) then drove up to the front of the house with its emergency lights activated. (*Id.* ¶ 24.) Three SWAT team members exited the rear of the vehicle and stood behind it, keeping the vehicle between them and the residence for cover and concealment. (*Id.*)

Over a loudspeaker, an officer announced that the Bellingham Police Department had a search warrant and probable cause for Officer Langton's arrest, and called for Officer Langton to come out and surrender. (*Id.* ¶ 25.) Officer Langton complied and was taken into custody around 9:51 p.m. without incident. (*Id.*) The arrest was accomplished with no use of force, no injuries to anyone, and no property damage. (*Id.* ¶ 28.)



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

When Detective Allen arrived on scene, she learned that Officer Langton had already been read his rights and that he had invoked his right to speak with a lawyer. (Allen Decl. ¶ 26.) Detective Allen told him that she had probable cause to arrest him for "criminal attempt for solicitation of a minor." (*Id.*) In hindsight, she now realizes she could have been clearer, because she was combining attempt and criminal solicitation. (*Id.*) But she had both concepts in mind, as she believed Officer Langton had both attempted to rape a child and that he had solicitated Ms. Harp to allow access to her daughter. (*Id.*)

Officer Langton asked for the name of the complainant, and Detective Allen declined to discuss that with him but pointed out that he would be able to read it in the probable-cause statement. (*Id.* ¶ 27.) Other officers then transported Officer Langton to the Skagit County Jail. (*Id.*)

**F. The search of his house revealed that Officer Langton destroyed evidence.**

Detective Allen checked the backyard firepit and saw smoldering papers. (*Id.* ¶ 28.) There was a partially burned magazine atop the pile of burned papers, but that was the only thing that was still readable. (*Id.*)

Inside the house, detectives seized multiple laptops and cell phones. (*Id.* ¶ 29.) When detectives tried to switch Officer Langton's personal iPhone to "airplane mode" to prevent any ingoing or outgoing data, the phone was displaying an initial-setup screen. (*Id.*) This indicated that Officer Langton had performed a factory reset, which deletes all personal data from the phone. (*Id.*) This was further proof that he had intentionally



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

destroyed evidence.[5] (*Id.*)

In Officer Langton's bedroom, there was a gun safe, two smaller safes, and a large stockpile of ammunition. (*Id.* ¶ 30.) Deputy Prosecuting Attorney Kooistra advised Detective Allen to contact him the next day for help seeking a warrant to open all three safes, as he did not want to call Judge Jones again that evening. (*Id.*)

### G. Follow-up investigation

The following morning, Detective Allen spoke with prosecutors again. (*Id.* ¶ 31.) They advised that the crime of Attempted Child Molestation in the 2nd Degree best fit the facts known at that time. (*Id.*) Detective Allen revised the Probable Cause Affidavit to reflect that charge and submitted it to the Skagit County Jail where Officer Langton was being held.[6] (Allen Decl. ¶ 31 & Ex. D.)

Detective Allen was also still investigating the crime of Possession of Depictions of Minors Engaged in Sexually Explicit Conduct—that is, child pornography. (Allen Decl. ¶ 32.)

Detective Allen testified before Judge Jones regarding the additional facts learned and to apply for search warrants authorizing detectives to reenter Officer Langton's home, open his safes, and search his electronic devices. (*Id.* ¶ 33.) Judge Jones approved the warrants, finding there was probable cause for Attempted Child Molestation in the 2nd Degree and Possession of Depictions of Minors Engaged in Sexually Explicit Conduct. (Allen Decl. ¶ 33 & Ex. E.)

---

5 At his deposition, Mr. Langton admitted that the reset his iPhone after the call from Lieutenant VanderYacht. (Grindeland Decl. Ex. B (Langton Dep. Tr.) at 46:22–48:5.)

6 Detective Allen forgot to change the date from July 26 to July 27 when she updated the Probable Cause Affidavit. (Allen Decl. ¶ 31.)



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Detectives subsequently searched the safes but did not find anything of evidentiary value. (Allen Decl. ¶ 34.)

When a forensic analysis was performed on Officer Langton's laptop, it showed that he had accessed his Microsoft OneDrive cloud storage at 9:48 p.m. on July 26. (*Id.* ¶ 36.) This was after learning he was under investigation and approximately three minutes before he was taken into custody. (*Id.*)

The search of Officer Langton's electronic devices also revealed four e-mail addresses he had been using. (*Id.* ¶ 37.) Detectives sent preservation letters to the hosts of those e-mail accounts and his internet service providers. (*Id.* ¶ 38.) In August 2022, Detective Allen applied for search warrants for records from Officer Langton's e-mail accounts and cell phones. (*Id.* ¶ 39.) Judge Jones approved the warrants after again finding probable cause to believe that Officer Langton had committed Attempted Child Molestation in the 2nd Degree and Possession of Depictions of Minors Engaged in Sexually Explicit Conduct. (Allen Decl. ¶ 39 & Ex. F.) None of the records eventually received in response to the warrants included anything of evidentiary value, however. (Allen Decl. ¶ 39.)

Detectives were never able to determine what was on Officer Langton's iPhone before he performed a factory reset or what he might have deleted from his OneDrive account minutes before he was arrested. (*Id.* ¶ 40.)

**H. Criminal prosecution**

On July 28, 2022, the Whatcom County Prosecuting Attorney's Office charged Officer Langton with Attempted Child Molestation in the Second Degree. (*Id.* ¶ 41 & Exs. G & H.) A Superior Court Commissioner found that probable cause supported the charge.



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

(Allen Decl. ¶ 42 & Ex. I.)

Approximately six months later, the prosecutor moved to dismiss the criminal case without prejudice on the grounds that there was insufficient evidence to prove beyond a reasonable doubt that Officer Langton took a "substantial step" towards commission of child molestation, despite sufficient evidence that he intended to commit that crime. (Allen Decl. ¶ 43 & Ex. J.)

The prosecutor informed Detective Allen that it was dropping the charge but did not ask for her input. (Allen Decl. ¶ 44.) She still believes that Officer Langton took a substantial step toward committing Rape of a Child or Child Molestation by initiating a relationship with Ms. Harp after learning she had a 12-year-old daughter, spending two weeks grooming her and pestering her about his desire to have sex with a 12-year-old girl, and then telling Ms. Harp that he wanted to "play" with her daughter at a nude beach. (*Id.*)

## II. ARGUMENT

The Court should grant summary judgment in favor of the Defendants and on all claims due to lack of evidence. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FRCP 56(a). A party may move for summary judgment by pointing out "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

To avoid summary judgment, the nonmoving party must then identify "specific facts" showing there is a genuine issue for trial, *id*. at 324, and "present significant probative evidence" to support his claims, *Intel Corp. v. Hartford Accident & Indem. Co.*,



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

952 F.2d 1551, 1558 (9th Cir. 1991) (quotation marks omitted). A party opposing summary judgment must identify admissible evidence to show that a fact is genuinely disputed. FRCP 56(c)(1)(B). Here, there are no genuine disputes about the material facts, and all claims should be dismissed as a matter of law.

This motion addresses Plaintiff's claims in the order listed in the Complaint:

- An excessive-force claim under federal law against the City and Deputy Chief Almer;
- An assault claim under Washington law against the City and Deputy Chief Almer;
- A false-arrest claim under Washington law against the City and Lieutenant Cristelli and a false-imprisonment claim under Washington law against all three Defendants; and
- A negligent-investigation claim against all three Defendants.

### A. The excessive-force claim fails for multiple reasons.

Plaintiff's § 1983 excessive-force claim should be dismissed on summary judgment because no force was used. In the alternative, if anything officers did could be construed as force, it was reasonable rather than excessive. Furthermore, Deputy Chief Almer is entitled to qualified immunity, and there is no evidence supporting municipal liability.

#### *1. No force was used against Mr. Langton.*

An arrest, which is a seizure under the Fourth Amendment, may be accomplished by either physical force or a suspect's submission to a show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Here, Mr. Langton was arrested when he submitted to a show of authority rather than by force.

The few cases that seem to characterize the use of a SWAT team as "force" are



SEAMARK LAW GROUP PLLC
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

inapplicable, because they involved breach-and-entry tactics (breaking down a door and entering with guns drawn) rather than surround-and-callout tactics like those used here. *See, e.g., Alexander v. City & County of S.F.*, 29 F.3d 1355, 1358, 1366–67 (9th Cir. 1994), *abrogated on other grounds by County of L.A. v. Mendez*, 581 U.S. 420 (2017).

Instead, this case is like *Howell v. Municipality of Anchorage*, 646 F. Supp. 3d 1047, 1066–67 (D. Alaska 2022), which rejected the argument that a SWAT team announcing its presence outside a residence to execute a warrant was a use of "force." The court characterized such announcements as warnings that should be given before using force. *Id.* at 1066. Thus, there was "no constitutional violation when the police officers issued warnings pursuant to standard police practice and in accordance with the requirements of the Fourth Amendment." *Id.* The actual force at issue in *Howell*, which included use of chemical agents, was used after the announcements. *Id.* at 1066–67.

In this case, the only tactic the Bellingham SWAT team used was surrounding the house and making an announcement, which *Howell* explained is not a use of force. Mr. Langton submitted to the SWAT team's authority without any physical force being necessary. *See Hodari D.*, 499 U.S. at 626. Since he was arrested without the use of *any* physical force, there could be no *excessive* force.

Indeed, Plaintiff's police expert conceded that the SWAT team's surround and callout was not a use of force. (Grindeland Decl. Ex. C (Hicks Dep. Tr.) at 81:6–23, 104:18–105:21.) He opined that, "the use of force, the only one that I found with the information I have . . . was against his son." (*Id.* at 105:18–21.) But the opinion that a SWAT officer pointed a rifle at Mr. Langton's son lacks evidentiary support and is irrelevant because his son is not a party. *Mabe v. San Bernardino County*, 237 F.3d 1101,



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

1111 (9th Cir. 2001). Although Mr. Langton testified at his deposition that he thought he recalled a police officer pointing a rifle at him as he exited his house (*see* Grindeland Decl. Ex. B (Langton Dep. Tr.) at 51:23–52:25, 53:25–56:4), his own expert does not endorse that, and video of the arrest proves it did not occur (*see* Almer Decl. ¶ 31 & Ex. B). Therefore, that testimony must be disregarded when considering summary judgment. *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

Since there is no evidence of any force being used against Mr. Langton, his excessive-force claim must be dismissed on summary judgment.

***2. As a matter of law, any force used was not excessive.***

Alternatively, if the SWAT team's surround-and-callout operation is construed as force, it was reasonable rather than excessive.

Excessive-force claims arising out of an arrest are analyzed under the reasonableness standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). The reasonableness of the use of force may be determined as a matter of law on summary judgment. *See Harris*, 550 U.S. at 381 n.8. Specifically, once a court has "drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*," the objective reasonableness of a use of force "is a pure question of law." *Id.*

The reasonableness analysis requires a court to consider the "type and amount of force" used, the "government's interest in the use of force," and the balance between those two factors. *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022).

When assessing the type and amount of force used, a court should consider the "nature and degree of physical contact" as well as the "risk of harm and the actual harm experienced." *Id.* at 1152 (quotation marks omitted).



**SEAMARK LAW GROUP PLLC**
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

When assessing the government's interest, a court should consider (1) the severity of the crime, (2) whether the suspect posed an immediate threat, and (3) whether the suspect was resisting or attempting to evade arrest. *Id.* at 1153. This is a non-exhaustive list, so a court should consider the totality of the circumstances, including the availability of less intrusive alternatives to the force used and whether warnings were given. *Id.* But it is well established that officers are not restricted to the least amount of force possible, so long as the force they use is reasonable. *Id.* at 1151. A court should also take into consideration the suspect's relative culpability in creating a risk that led officers to use force. *Id.* at 1153.

In this case, all factors support the conclusion as a matter of law that using the SWAT team to conduct a surround and callout was reasonable.

With respect to the type and amount of force used, there was no physical contact other than handcuffing. Mr. Langton has not alleged that this was excessive force, and routine handcuffing without evidence of injury does not support an excessive-force claim. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001). Mr. Langton did not sustain any injuries, and the risk of harm was minimal. In fact, a surround and callout is less risky than other potential tactics such as a forced entry, which can surprise a suspect or initiate contact before the suspect is ready to surrender. If a surround and callout can even be construed as a use of force, it is minimal.

The alleged force used was justified by a strong governmental interest in arresting Mr. Langton. He was suspected of very serious offenses—attempted rape of a child and possession of child pornography. He also potentially posed a threat to the safety of officers and the public, considering his police training, possession of numerous firearms,



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

and abuse of police authority by targeting a family he met while on duty. Further, while he had not yet resisted or attempted to flee, Mr. Langton was observed to be destroying evidence. Mr. Langton rebuffed officers' attempts to use less-intrusive methods to arrest him, such as phone calls and text messages.

In *Strong v. City of Eugene*, No. 6:14-cv-01709-AA, 2016 WL 3032687, at *3 (D. Or. May 25, 2016), *aff'd* 735 F. App'x 312, 315 (9th Cir. 2018), the court granted summary judgment in favor of defendants on a claim that utilizing a SWAT team to conduct a surround and callout was excessive force. The court noted that the team did not use more aggressive tactics such as breaching doors, entering a residence in the middle of the night, or using flash-bang devices. *Id.* The logic of *Strong* applies, and summary judgment is appropriate.

The fact that Mr. Langton was arrested during twilight hours is irrelevant. The cases in which the Ninth Circuit has cautioned about use of a SWAT team at night involved situations where officers breached doors, used flash-bang devices, and made entry while occupants were asleep. *See, e.g., Bravo v. City of Santa Maria*, 665 F.3d 1076, 1081–82 (9th Cir. 2011). In contrast, the Bellingham SWAT team merely conducted a surround and callout while Mr. Langton and his son were observed to be awake and active.

Moreover, the court in *Bravo* noted that circumstances could justify forced entry at night, such as to prevent the destruction of evidence. *See id.* at 1085–86. That specific circumstance was present in this case where the SWAT team arrested Mr. Langton after he started burning documents in his backyard fire pit.



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Finally, even if there were admissible evidence to support Mr. Langton's unfounded allegation that a rifle was pointed at him as he exited his house, that would not constitute excessive force. When executing a felony search warrant, it is reasonable for officers to point a gun at even a "calm and compliant" person until he is handcuffed. *Lu v. Jackson*, No. 22-55457, 2023 WL 4759238, at *1 (9th Cir. July 26, 2023).

***3. Deputy Chief Almer is entitled to qualified immunity.***

Qualified immunity is an additional reason to dismiss the excessive-force claim against Deputy Chief Almer. Police officers have qualified immunity unless they (1) violated a constitutional right and (2) the right was clearly established at the time. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014).

To be clearly established, the law must have been "sufficiently clear that every reasonable official would understand that what he was doing" was unlawful. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quotation marks omitted). This requires that the relevant legal principle be clear at a "high degree of specificity." *Id*. (quotation marks omitted).

Mr. Langton cannot point to any court decision clearly establishing that use of a SWAT team to conduct a surround and callout was unlawful in this situation. Indeed, courts have rejected challenges to this tactic. *See, e.g., Strong*, 2016 WL 3032687, at *3; *Howell*, 646 F. Supp. 3d at 1066. Thus, Deputy Chief Almer is entitled to qualified immunity.

***4. There is no evidence supporting municipal liability.***

The excessive-force claim against the City should be dismissed for the additional reason that there is no evidence supporting municipal liability. A city cannot be held liable



**SEAMARK LAW GROUP PLLC**
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510

under § 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Instead, municipal liability can be imposed only if an "official policy" was "the moving force" behind a constitutional violation. *Id*. at 694–95.

To satisfy this requirement, a plaintiff must prove one of three theories: (1) the violation was caused by an official policy; (2) the violation was caused by a failure to train or discipline employees amounting to "deliberate indifference"; or (3) an official with final policymaking authority committed the violation or ratified it. *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802–03 (9th Cir. 2018).

Mr. Langton's allegation that the City has a policy of giving "complete freedom and flexibility to officers to decide when to orchestrate a SWAT raid on a defendant's home" is not accurate. On the contrary, the Bellingham Police Department has written guidelines regarding when to consider using the SWAT team, uses a threat-assessment form to provide officers guidance on when to consult with SWAT, and specifies who may activate the SWAT team, including the Deputy Chief of Operations, which was Deputy Chief Almer's title at the time. (*See* Almer Decl. ¶ 34 & Ex. C.)

Nor can Mr. Langton meet the "stringent standard of fault" for a deliberate-indifference theory relating to an alleged failure to train or discipline, as that generally requires evidence of a prior pattern of similar constitutional violations. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quotation marks omitted); *accord Rodriguez*, 891 F.3d at 803. Since Mr. Langton has no evidence of a prior pattern of similar incidents, there is no support for a failure-to-train or failure-to-discipline theory of municipal liability.

**B. There was no assault.**

The Court should grant summary judgment in favor of the City and Deputy Chief



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Almer on Mr. Langton's state-law claim for assault. Police officers are authorized to use reasonable force, and Mr. Langton lacks evidence supporting the required elements of assault.

#### ***1. Police use of reasonable force is not an assault.***

Police officers have legal authority to use force to make arrests, so they can be liable for assault or battery only if the force used was excessive rather than reasonable. *Boyles v. City of Kennewick*, 62 Wn. App. 174, 176 (1991). The reasonableness analysis is identical to the analysis for excessive-force claims under federal law. *Van Loo v. United States*, No. 3:23-CV-05618-DGE, 2025 WL 692484, at *20 (W.D. Wash. Mar. 4, 2025)*; accord Anderson v. City of Bainbridge Island*, 472 F. App'x 538, 540 (9th Cir. 2012).

As explained above, the use of the SWAT team was reasonable, based on the totality of the circumstances. Therefore, the assault claim fails.

#### ***2. There is no evidence supporting the elements of assault.***

To the extent that Mr. Langton's assault claim relates to his allegation that an officer pointed a rifle at him, it also fails for lack of evidence as discussed above.

Furthermore, there is no evidence of either apprehension of contact or an intent to create such an apprehension, which are required elements of assault. *Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wn. App. 859, 867 (2014). While Mr. Langton may believe he saw an officer point a rifle at him, the video of the arrest shows that this did not occur. Nor is there evidence that any officer (much less Deputy Chief Almer or the City) intended to cause an immediate apprehension of harm.

### C. The false-arrest and false-imprisonment claims fail for multiple reasons.

Mr. Langton's claims under Washington law for false arrest (by the City and



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Lieutenant Cristelli) and false imprisonment (by all three Defendants) fail because the arrest was supported by probable cause.[7] Additionally, Lieutenant Cristelli and Deputy Chief Almer have qualified immunity since they acted pursuant to a valid warrant.

***1. Mr. Langton's arrest was supported by probable cause.***

Probable cause is a complete defense to an action for false arrest or false imprisonment. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 563 (1993). The standards for probable cause under federal and state law are the same. *See Ibarra v. Snohomish County*, No. C16-0317JLR, 2016 WL 4193863, at n.13 (W.D. Wash. 2016).

Probable cause exists when "officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir.2007); *accord State v. Gaddy*, 152 Wn.2d 64, 70 (2004).

Probable cause is a "commonsense, practical question" to be determined based on the "totality of the circumstances," including reasonable inferences. *Illinois v. Gates*, 462 U.S. 213, 230, 238, 240 (1983). Probable cause means "fair probability," not certainty or even a preponderance of the evidence. *Id.* at 235, 238. It does not require the arresting officer to "have evidence to prove each element of the crime beyond a reasonable doubt." *Gaddy*, 152 Wn.2d at 70. It "is not a high bar." *Wesby*, 583 U.S. at 57 (quotation marks omitted). Where the material facts are not in dispute, the existence of probable cause is a question of law. *Peng v. Mei Chin Penghu,* 335 F.3d 970, 979–80 (9th Cir. 2003).

---

[7] While Mr. Langton pleads false-arrest and false-imprisonment as separate claims, the "gist" of, and defenses and immunities to, the two torts are the same. *Youker v. Douglas County*, 162 Wn. App. 448, 465–67 (2011).



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

Importantly, because probable cause is an objective inquiry, the reason an officer cites for making an arrest "need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

Mr. Langton's arrest was supported by probable cause to believe he had committed multiple offenses. Ms. Harp had reported to police that Mr. Langton: (1) was sexually "obsessed" with children; (2) had initiated a relationship with her after learning she had a 12-year-old daughter; (3) had spent two weeks repeatedly trying to get her to watch child pornography with him and constantly messaging her in detail about his desire to perform oral sex on 12-year-old girls; and finally (4) asked to "play" with her 12-year-old daughter at a nude beach. Mr. Langton's numerous texts corroborated this.

These facts established probable cause for the following crimes:

- Attempted Rape of a Child in the 2nd Degree (RCW 9A.28.020 & RCW 9A.44.076);
- Attempted Child Molestation in the 2nd Degree (RCW 9A.28.020 & RCW 9A.44.086);
- Criminal Solicitation of Rape of a Child in the 2nd Degree (RCW 9A.28.030 & RCW 9A.44.076);
- Criminal Solicitation of Child Molestation in the 2nd Degree (RCW 9A.28.030 & RCW 9A.44.086);
- Possession of Depictions of Minor Engaged in Sexually Explicit Conduct (RCW 9.68A.070); and
- Viewing Depictions of a Minor Engaged in Sexually Explicit Conduct (RCW 9.68A.075).

The attempt crimes listed above require the suspect to take a "substantial step" toward committing the underlying substantive offense. RCW 9A.28.020. Cases concerning attempted sexual offenses against children often focus on defendants'



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

communications with individuals they believed to be a minor or parent of a minor. *See, e.g.*, *State v. Canter*, 17 Wn. App. 2d 728, 740 (2021). Here, the facts known to the officers included evidence of a "substantial step" because Mr. Langton's extensive communications with a 12-year-old girl's mother were documented in explicit detail. (*See* Allen Decl. Exs. A–B.) He also had the mother download and use an encrypted-messaging app to communicate with him, had her over to his home for a sexual encounter, and went to her apartment, where he spoke with the 12-year-old girl in person.

The solicitation crimes listed above require the suspect to offer a "thing of value." RCW 9A.28.030. Notably, however, a thing of value can include "community, protection, companionship" or a continued relationship. *State v. Valdiglesias LaValle*, 2 Wn. 3d 310, 313, 322 (2023). Here, the facts included evidence of an implicit offer of this type of "thing of value" because Mr. Langton appeared to be offering Ms. Harp a relationship in exchange for help gaining access to minors, including her daughter. (*See* Allen Decl. Exs. A–B.)

Additionally, after Mr. Langton was informed that he was under investigation, officers saw him burning what appeared to be documents in his backyard firepit. (Almer Decl. ¶ 20.) This established probable cause for the crime of Tampering with Physical Evidence, which involves destroying or altering physical evidence with intent to impair its appearance or availability in an official proceeding when the person knows that a proceeding is pending or about to be instituted. RCW 9A.72.150.

Before the arrest, two prosecuting attorneys and a Superior Court judge agreed there was probable cause, and a search warrant was issued. (Allen Decl. ¶¶ 18–20 & Ex. C.) After the arrest, a prosecutor agreed there was probable cause when he filed the



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

charge of Attempted Child Molestation in the 2nd Degree, and a Superior Court commissioner agreed there was probable cause at a preliminary hearing. (Allen Decl. ¶¶ 41–42 & Exs. G–I.)

Mr. Langton's contention that the charge listed on his arrest paperwork was incorrect does not undermine the existence of probable cause for the offenses listed above. Under *Devenpeck*, probable cause for any crime justifies an arrest, regardless of what crime an officer identified at the time of arrest. 543 U.S. at 153–55.

Further, Mr. Langton's contention that Lieutenant Cristelli was biased against him is irrelevant. "An otherwise lawful arrest does not become unlawful even if prompted by malicious motives, and the existence or nonexistence of malice is immaterial to the question of liability for false arrest or false imprisonment." *Bender v. City of Seattle*, 99 Wn.2d 582, 591 (1983).

#### ***2. Lieutenant Cristelli and Deputy Chief Almer have qualified immunity.***

The false-arrest and false-imprisonment claims against Lieutenant Cristelli and Deputy Chief Almer should be dismissed for the additional reason that they have qualified immunity under state law. In Washington, an officer has qualified immunity where the officer (1) carries out a statutory duty, (2) according to procedures dictated by statute and superiors, and (3) acts reasonably. *McKinney v. City of Tukwila*, 103 Wn. App. 391, 407 (2000).

These three requirements are met here. First, police officers are carrying out a statutory duty when they enforce criminal laws. *See id.* Second, the officers' actions complied with all applicable statutes and departmental procedures. *See, e.g.*, *Deskins v.*



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

*City of Bremerton*, No. C08-015127-RBL, 2009 WL 1247067, at *9 (W.D. Wash. May 4, 2009). And as explained above, it was reasonable to believe that there was probable cause to arrest Mr. Langton for multiple offenses, especially after prosecutors agreed and a judge issued a search warrant. *See Youker v. Douglas County*, 162 Wn. App. 448, 465 (2011) (qualified immunity "is available in cases where the officer makes an arrest under a facially valid warrant or process even if there are facts within his knowledge that would render it void as a matter of law").

### D. The negligent-investigation claim is improper

Mr. Langton's claim for negligent investigation under Washington law is improper and must be dismissed. "In general, Washington common law does not recognize a claim for negligent investigation because of the potential chilling effect such claims would have on investigations." *Janaszak v. State*, 173 Wn. App. 703, 725 (2013). Outside of the narrow context of child-abuse investigations by the Department of Social & Health Services, Washington courts have consistently refused to recognize negligent-investigation claims against law-enforcement officers. *Id.*

Even if the claim were cognizable, officers had probable cause to arrest Mr. Langton for multiple offenses as discussed above, refuting any allegation of negligence in connection with the arrest. *See Farris v. Culp*, 645 F. Supp. 3d 1058, 1074 (E.D. Wash. 2022).

## III. CONCLUSION

For these reasons, all claims must be dismissed on summary judgment.



**SEAMARK LAW GROUP PLLC**
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

DATED: October 10, 2025

SEAMARK LAW GROUP PLLC
Attorneys for Lieutenant Cristelli

I certify that this memorandum contains 8,257 words (*i.e.*, less than 8,400 words), in compliance with the Local Rules.

*s/Geoff Grindeland*
Geoff Grindeland, WSBA No. 35798

*s/Jesse A. Townsend*
Jess A. Townsend, WSBA No. 63238

Seamark Law Group PLLC
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510
geoff@seamarklaw.com
jesse@seamarklaw.com

CITY OF BELLINGHAM
Attorney for the City of Bellingham and Donald Almer

*s/Karen M. Phillips*
Karen M. Phillips, WSBA No. 45305
Assistant City Attorney
210 Lottie Street
Bellingham, WA 98225
(360) 778-8295
kmphillips@cob.org

## CERTIFICATE OF SERVICE

I certify that on the date below I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

- **Counsel for Plaintiff**; and
- **Counsel for the City of Bellingham & Deputy Chief Almer**

DATED: October 10, 2025

*s/Geoff Grindeland*
Geoff Grindeland



**SEAMARK LAW GROUP PLLC**
400 WINSLOW WAY E, STE 230
BAINBRIDGE ISLAND, WA 98110
(206) 502-2510