UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICHAEL SCOTT LANGTON, | CASE NO. 2:24-cv-01073-KKE |
| Plaintiff(s), | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| THE CITY OF BELLINGHAM, et al., | |
| Defendant(s). | |

Plaintiff Michael Scott Langton was arrested by Bellingham Police Department officers at his home on suspicion of having committed felony offenses.  After Langton's charges were dismissed months after his arrest, he filed this action against the City of Bellingham ("the City") and two officers involved with his arrest, bringing a claim for unreasonable seizure and excessive force under 42 U.S.C. § 1983, plus state-law claims for assault, false arrest, false imprisonment, and negligent investigation.  Dkt. No. 1.

Defendants filed a joint motion for summary judgment as well as a motion to exclude Langton's expert, and Langton filed a motion to exclude Defendants' expert as well.  Dkt. Nos. 19, 22, 28.  Because the Court finds that Defendants are entitled to summary judgment without consideration of the disputed expert opinions, the Court will grant Defendants' summary judgment motion and deny as moot the motions to exclude.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

## I.    BACKGROUND

**A.    Langton Is Investigated and Arrested on July 26, 2022.**

On July 26, 2022,[1] Jasmine Harp called 911 to report concerns regarding Ferndale Police Officer Scott Langton, with whom she had had a brief sexual relationship.  *See* Dkt. No. 25 ¶¶ 4, 6, 8, 9.  Perceiving a conflict because the Sheriff's Office worked closely with the Ferndale Police Department, the Whatcom County Sheriff's Office referred this call to the Bellingham Police Department.  Dkt. No. 23 ¶ 3.  Bellingham Police Lieutenant Chad Cristelli reviewed Harp's call report and Detective Taylor Allen was assigned to interview Harp.  *Id.* ¶ 4.

Harp showed Detective Allen text messages she received from Langton wherein Langton disclosed that he was sexually attracted to children as young as 12 and asked Harp to watch "young porn" with him.  Dkt. No. 25 ¶ 10.  In one message, Langton told Harp that he wanted to play with her and her daughter (who was 12 years old at the time) at a nude beach.  *Id.* ¶ 11.  Harp told Detective Allen that she wanted a restraining order against Langton, and that she was concerned that Langton would use his own son as a shield if police arrested him at home.[2]  *Id.* ¶¶ 15, 51.

Detective Allen believed there was probable cause to arrest Langton for several felonies.  Dkt. No. 25 ¶ 17.  Because of the serious nature of the offenses and the fact that Langton was a police officer, a Bellingham Police Department sergeant contacted the Whatcom County Prosecuting Attorney's Office for advice.  Dkt. No. 23 ¶ 8.  Two prosecutors met with Detective Allen and Lieutenant Cristelli and others to discuss the case.  *Id.*  The prosecutors agreed with

---

[1] All of the events described in this section occurred on this date.

[2] Langton's opposition brief contains a motion to strike hearsay statements contained in Defendants' declarations, namely statements of Harp, Whatcom County prosecutors, Ferndale officers, and SWAT officers.  Dkt. No. 31 at 4–6.  Because the alleged hearsay statements were made by individuals available to testify at trial, which would eliminate the hearsay issue, the Court will deny Langton's motion to strike.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006) (explaining that "when evidence is not presented in an admissible form in the context of a motion for summary judgment, *but it may be presented in an admissible form at trial*, a court may still consider that evidence" in ruling on the motion).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2

Detective Allen that there was probable cause to arrest Langton, suggesting that the offenses that best fit the facts would be "solicitation of a minor" and "possession of child pornography." Dkt. No. 25 ¶ 18. The prosecutors also suggested that the officers should obtain and execute a search warrant for Langton's home as soon as possible, to prevent the destruction of evidence that could occur if Langton learned that Harp had reported his conduct to the police. *Id*. ¶ 19.

Lieutenant Cristelli consulted with Deputy Chief Donald Almer about the investigation because Lieutenant Cristelli was concerned that the arrest would present safety risks, given that Langton had access to firearms and specialized training in police tactics. Dkt. No. 23 ¶ 10. Deputy Chief Almer made the preliminary decision to ask the SWAT team to assemble at the police station, to minimize delay if the team was needed to execute the arrest. Dkt. No. 26 ¶ 5.

Detective Allen prepared a written statement of the facts, which a deputy prosecutor presented to a Whatcom County Superior Court judge. Dkt. No. 25 ¶ 20. The judge authorized a search warrant, finding probable cause as to "solicitation of a minor" and "possession of child pornography." Dkt. No. 25-3.

Deputy Chief Almer and Lieutenant Cristelli met with Detective Allen and others to determine how to execute the search warrant and arrest Langton. Dkt. No. 25 ¶ 21. They agreed that taking Langton into custody would be the safest option because it would allow time for Harp and her daughter to seek a protective order and would protect the investigation because Langton would not have an opportunity to destroy evidence or attempt to contact witnesses. *Id*. Police officers completed a threat-assessment form to determine whether to deploy the SWAT team, noting certain risk factors applicable to arresting Langton at his home. *See* Dkt. No. 26-1 (noting that Langton has a police background, was suspected of committing a felony, possesses weapons, lives with his minor son, and there was less than 12 hours of time allowed for operational planning). The score on that form indicated that a SWAT consult was optional. *Id*. at 3. But

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 3

because Deputy Chief Almer believed that Langton may barricade himself in his home or resist arrest, and that he would be more dangerous if he chose to do so, Deputy Chief Almer thought it was nonetheless appropriate to deploy the SWAT team if other methods of arrest failed.  Dkt. No. 26 ¶ 8.

The officers decided that first, the Ferndale Police Department would call Langton and order him to report to the station so that he could be arrested there.  Dkt. No. 23 ¶ 13.  If he refused to comply, then crisis negotiators would call Langton and try to persuade him to surrender.  Dkt. No. 25 ¶ 23.  And if that failed, then the SWAT team would be sent to Langton's home to surround the house, announce their presence, and instruct Langton over a loudspeaker to exit his home.  *Id*.

After this three-step plan was developed, Deputy Chief Almer and the SWAT team traveled to a staging area near Langton's home, while Lieutenant Cristelli and Detective Allen went to the Ferndale Police Department.  Dkt. No. 23 ¶ 14.  Officers used drones equipped with cameras to observe Langton's home, and Deputy Chief Almer watched a live feed of the drone video footage. Dkt. No. 26 ¶ 14.

Around 9:30 p.m., a Ferndale officer called Langton to inform him that he was under criminal investigation by the Bellingham Police Department and asked him to come to the Ferndale Police station to sign papers placing him on administrative leave.  Dkt. No. 23 ¶ 14, Dkt. No. 26 ¶ 16.  Langton said that he would not drive to the station because he had been drinking alcohol.  Dkt. No. 23 ¶ 14, Dkt. No. 26 ¶ 19.  He asked what crimes he was suspected of committing, but on Lieutenant Cristelli's orders the Ferndale officer refused to answer.  Dkt. No. 23 ¶ 14.  Lieutenant Cristelli informed Deputy Chief Almer that the call with Langton was not going well, and Deputy Chief Almer observed on the drone feed that Langton opened his door and looked outside.  Dkt. No. 23 ¶ 15, Dkt. No. 26 ¶ 17.  Deputy Chief Almer interpreted Langton's actions to mean that he wanted to see if police were at his home.  Dkt. No. 26 ¶ 17.

Around 9:40 p.m., Lieutenant Cristelli notified Deputy Chief Almer that Langton had refused to go to the Ferndale station and had been drinking. Dkt. No. 26 ¶ 19. Shortly after that, Deputy Chief Almer observed that Langton lit a fire in his backyard and was burning what looked like documents. *Id.* ¶ 20. Deputy Chief Almer believed that he had probable cause to suspect that Langton was committing the offense of tampering with physical evidence. *Id.*

Crisis negotiators then initiated the second step in the arrest plan: they called and texted Langton on his personal and work phones, but Langton did not respond. Dkt. No. 26 ¶ 21. Ferndale Police officers also tried calling, but Langton did not answer. *Id.* ¶ 22. At 9:49 p.m., Deputy Chief Almer ordered the SWAT team to move to the third step in the arrest plan. *Id.* ¶ 23.

The SWAT team arrived at Langton's home in a Bearcat vehicle (an unarmed rescue vehicle) with its emergency lights activated. Dkt. No. 26 ¶ 24. Three SWAT team members exited the rear of the vehicle and stood behind it, while an officer called over a loudspeaker to announce that the Bellingham Police Department had a search warrant and probable cause to arrest Langton. *Id.* ¶ 25. The officers asked Langton to come out and surrender. *Id.* Langton complied and was taken into custody around 9:51 p.m. *Id.*

By the time Detective Allen arrived at Langton's home, Langton had been advised of his rights and invoked his right to speak with a lawyer. Dkt. No. 25 ¶ 26. Detective Allen informed Langton that she had probable cause to arrest him for "criminal attempt for solicitation of a minor." *Id.* Langton asked Detective Allen for the name of the complainant, but Detective Allen refused to discuss this with him and told him he could read it in the probable cause statement. *Id.* ¶ 27. Langton asked again for this information, and Detective Allen told him that she thought he wanted to speak with a lawyer rather than discuss the case. *Id.* Langton confirmed that he wanted to speak with his lawyer before giving a statement, and another detective told Langton he could read the probable cause statement once he arrived at the Skagit County jail. *Id.*

Detective Allen then entered Langton's home to assist with the search.  Dkt. No. 25 ¶ 28. She saw a magazine smoldering in Langton's backyard fire pit, and saw that Langton had performed a factory reset on his personal cell phone.  *Id*. ¶¶ 28–29.

**B.    The Follow-up Investigation Culminates in the Dismissal of Criminal Charges Against Langton.**

In the days that followed Langton's arrest, Detective Allen amended the probable cause affidavit and applied for search warrants to authorize re-entry into Langton's home to open his safes and search his electronic devices.  Dkt. No. 25 ¶ 31.  A Whatcom County Superior Court judge approved additional search warrants.  Dkt. No. 25-5.  Officers did not find anything of evidentiary value in Langton's safes, and determined that he had accessed his computer's storage after he learned he was under investigation and three minutes before he was taken into custody. Dkt. No. 25 ¶¶ 34, 36.  Detective Allen requested and obtained additional search warrants seeking records from Langton's email accounts, but none of the records received in response contained anything of evidentiary value.  *Id*. ¶ 39.  Detective Allen was not able to determine what was deleted from Langton's phone during the factory reset, or what may have been deleted from his computer before his arrest.  *Id*. ¶ 40.

Langton was charged with attempted child molestation in the second degree, but the prosecutor moved to dismiss the charge without prejudice approximately six months later due to insufficient evidence.  Dkt. No. 25 ¶ 43.

Langton filed this action in July 2024 against the City, Lieutenant Cristelli, and Deputy Chief Almer.  Dkt. No. 1.  Defendants filed a joint motion for summary judgment (Dkt. No. 22) that is ripe for resolution.

## II.   ANALYSIS

### A.   Legal Standards on Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims[,]" so that "factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 327 (1986).  In resolving a motion for summary judgment, the court considers "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

### B.   The Excessive Force Claims Are Dismissed.

Individuals may file civil actions against police officers for violating their constitutional rights.  *See* 42 U.S.C. § 1983 (indicating that "[e]very person" acting under the color of state law who deprives a person of a statutory or constitutional right "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …").  Municipalities may constitute a "person" for purposes of Section 1983 liability when "action pursuant to official municipal policy of some nature caused a constitutional tort."  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 7

seizures." The "basic purpose of this Amendment … is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967). In effecting a seizure, police officers have "the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id*. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (citation modified).

To determine whether a particular use of force is reasonable, courts engage in a three-step *Graham* evaluation, first identifying the type and amount of force inflicted to assess the severity of the intrusion on the plaintiff's Fourth Amendment rights, then considering the governmental interests that support the need to use force, and finally balancing the intrusion on the individual's rights against the government's need to intrude. *Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018).

In this case, Langton brings Fourth Amendment claims against Deputy Chief Almer and the City, and for the following reasons, the Court will grant Defendants' motion for summary judgment on these claims.

1.  <u>Deputy Chief Almer Is Entitled to Summary Judgment on Langton's Claim for Excessive Force.</u>

Langton contends that the force used to arrest him was excessive because officers pointed "high-powered rifles" at him, his son, and his home.[3] Dkt. No. 31 at 6 (referencing Dkt. No. 33 at 52–58 (Langton's deposition testimony)). Langton acknowledges that there is conflicting evidence as to whether any officers did, in fact, point weapons at or near him, his son, or their home, but argues that these disputed facts should be presented to the jury and should not be resolved on summary judgment. *Id.*

Defendants disagree, relying on the videorecording of Langton's arrest to contend that no officers pointed weapons at Langton and that they, in fact, remained behind a vehicle for the entire

---

[3] Langton also seems to suggest that the mere deployment of SWAT officers at night constitutes excessive force (Dkt. No. 31 at 9), but cites no Ninth Circuit authority indicating that staffing his arrest in this manner constitutes a use of force at all. In *Bravo v. City of Santa Maria* ("*Bravo I*"), a plaintiff challenged the issuance and execution of a search warrant, where a SWAT team served a search warrant at 5:30 a.m., entering the home "by shooting off the front door locks and deploying two 'flashbang' grenades, or light-sound diversionary devices, outside the back door[,]" while the residents of the household were sleeping. 665 F.3d 1076, 1081–82 (9th Cir. 2011). The Ninth Circuit explained that "[a] nighttime incursion by a SWAT force is a far more serious occurrence than an ordinary daytime intrusion pursuant to a regular warrant and therefore requires higher justification beyond mere probable cause to search." *Id.* at 1085.

But here, there was no "incursion" by a SWAT force or any other officer; the officers used a loudspeaker to ask Langton to exit his home, and Langton complied. Although the *Bravo I* court cited to a Third Circuit opinion holding that the "decision to employ a SWAT-type team can constitute excessive force if it is not objectively reasonable to do so in light of the totality of the circumstances" (665 F.3d at 1085 (citing *Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005)), Langton does not cite any Ninth Circuit authority so holding, nor is the Court aware of any such Ninth Circuit authority. In subsequent litigation regarding attorney's fees, the Ninth Circuit itself summarized the *Bravo I* opinion as holding that "greater justification is needed for a nighttime forced entry by a SWAT unit than for an ordinary search." *Bravo v. City of Santa Maria* ("*Bravo II*"), 810 F.3d 659, 666 (9th Cir. 2016). The Court thus declines to read *Bravo I* as broadly as Langton suggests, to mean that the Ninth Circuit has held that the mere presence of a SWAT team at an arrest can constitute excessive force.

Defendants cite *Howell v. Municipality of Anchorage*, where the District of Alaska characterized a SWAT team's announcements over a loudspeaker as "warnings that officers should give, when feasible, before employing force[,]" rather than a "threat," as claimed by the plaintiff. 646 F. Supp. 3d 1047, 1066 (D. Alaska 2022). Based on that wording, the Court reads *Howell* to suggest that the presence of SWAT officers outside a suspect's home is not a use of force in itself, but is perhaps a precursor to a use of force. Langton contends that *Howell* is distinguishable because he (unlike the *Howell* plaintiff) does not contend that Defendants' loudspeaker warnings constitute a use of force (Dkt. No. 31 at 7). If Langton's briefing could nonetheless be read to argue that mere deployment of a SWAT team to effectuate an arrest is a use of force that could be excessive, the Court finds such an argument to be without Ninth Circuit support. Accordingly, this order focuses on the use of force that is the focus of Langton's briefing: the pointing of firearms at Langton, his son, and his home. *See* Dkt. No. 31 at 7.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 9

encounter and therefore could not have pointed a weapon directly at Langton. Dkt. No. 38 at 3–4. But the videorecording does not capture the activity of the officers during the entire encounter outside Langton's home. During much of that encounter, the videorecording focuses on Langton, who is shown walking toward the officers with his hands up, and the officers are out of visual range. *See* Dkt. No. 26-2. To be sure, the videorecording does not depict any officer aiming a firearm at Langton or anyone/anything else, but because the officers are not in view for the entirety of the encounter, it does not directly contradict Langton's deposition testimony that he saw officers point weapons at him.

One of the officers testified in a deposition that, although he does not independently remember Langton's arrest specifically, it is his practice not to aim his weapons at a suspect unless that person is an immediate threat. *See* Dkt. No. 29 at 150–53. Another officer testified that he held his firearm high so that he could view a scene through its scope until the armored vehicle arrived, but after that point (when Langton was walking out of the house toward the officers) he was watching the scene with his eyes only. Dkt. No. 33 at 32–33. This testimony can be read to conflict with Langton's testimony.[4]

On summary judgment, the Court must view the evidence in the light most favorable to Langton to determine whether his excessive force claim should be presented to the jury. Thus, for purposes of this motion, the Court credits Langton's testimony that at least one firearm was aimed

---

[4] In particular, it conflicts with Langton's testimony that he remembers seeing a firearm pointed at him. But Langton did not identify the officer(s) involved. Specifically, Langton has not presented any evidence that Deputy Chief Almer pointed a firearm at Langton, directed anyone else to do so, or knew that anyone did. Section 1983 liability "must be based on the personal involvement of the defendant[,]" and there is no evidence linking Deputy Chief Almer to the use of force that Langton contends constitutes a constitutional violation. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). This failure alone could justify granting Defendants' motion as to Deputy Chief Almer. The remainder of this order nonetheless assumes, for the sake of argument, that a SWAT officer pointed a firearm at Langton and that this action could be traced to Deputy Chief Almer and/or the City.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 10

at him[5] during the approximately 30 seconds of time it took for him to walk from his front door to where he was handcuffed.  With respect to the first *Graham* step, the Ninth Circuit has found that aiming a loaded firearm at someone constitutes a high level of force.  *See Robinson v. Solano County*, 278 F.3d 1007, 1014–15 (9th Cir. 2002) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995)).

Turning to the second *Graham* step, the Court finds that the officers had a similarly high need for force in effectuating this arrest.  As a police officer himself, Langton had access to weapons and was well-trained in using them.  Dkt. No. 23 ¶ 10.  Langton was suspected of committing a stigmatizing felony.  Dkt. No. 26 ¶ 8.  Shortly before the officers arrived but after Langton realized he was under investigation, he told the police that he had been drinking alcohol and then stopped responding to them.  *See* Dkt. No. 23 ¶ 14; Dkt. No. 26 ¶¶ 21–22, 30.  These facts known to the officers at the time they arrived at Langton's house reasonably signaled increased safety risks and potential volatility.  Under these circumstances, the arresting officers had a heightened need to secure the scene of the arrest.

For purposes of the third *Graham* step, the Court balances the nature of the force used against the need for force.  If, as Langton alleges, officers aimed firearms at him until he was handcuffed, no reasonable jury could find that such a use of force was unreasonable.  *See Lu v. Jackson*, Nos. 22-55457 & 22-55683, 2023 WL 4759238, at *3 (9th Cir. July 26, 2023) ("It was not unreasonable for the deputies to point their guns at [the plaintiff] until he was handcuffed. While [he] was calm and compliant, the deputies were executing a felony search warrant for drugs

---

[5] Langton's son is not a party to this litigation, nor does Langton purport to bring any claims on his behalf, and thus any force used against Langton's son is not actionable here. *See Mabe v. San Bernadino Cnty., Dep't of Public Soc. Servs.*, 237 F.3d 1101, 1111 (9th Cir. 2001) (explaining that a parent has no standing to bring a claim to vindicate her child's Fourth Amendment rights).  Similarly, Langton has not cited any authority indicating that pointing a weapon at a house can constitute unconstitutional excessive force.  Accordingly, the Court focuses on the potential for a constitutional violation flowing from an officer aiming a firearm at Langton himself.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

and firearms, which 'is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.'").  Whereas in *Lu* the Ninth Circuit found that aiming weapons at a suspect was reasonable given only the nature of the crime at issue, the additional risk factors present in Langton's arrest only further underscore the reasonableness of the officers' use of force.  As in *Lu*, the Court concludes that "Defendants' interests in ensuring officer safety and facilitating an orderly search outweigh the intrusion on [Langton's] rights."  2023 WL 4759238, at *1.

This conclusion is supported by other authority as well.  *See, e.g., Rauda v. Wilkinson*, 844 F. App'x 945, 949 (9th Cir. 2021) (officers pointing firearms at plaintiff, plaintiff's wife, and one of plaintiff's children is a "relatively high use of force" that was nonetheless reasonable because plaintiff was known to have used a firearm in a previous gang-related shooting, and the officers "reasonably sought to secure the scene and [plaintiff's] person until they could assure their own safety"); *Anderson v. City of Bainbridge Island*, 472 F. App'x 538, 540 (9th Cir. 2012) (finding no excessive force where officers "trained their guns on [plaintiff] for only thirty seconds, just long enough to determine that he was unarmed and to arrest him"); *Usandivaras v. Eggleston*, No. C18-889 MJP, 2019 WL 2491919, at *4 (W.D. Wash. June 14, 2019) (finding no excessive force when officers knew plaintiff owned a weapon and "the officers aimed their weapons at Plaintiff only until he was handcuffed and patted down, the point at which the officers knew Plaintiff no longer had access to his weapon").

The facts of this case are readily distinguishable from the only case cited by Langton, *Thompson*.  Although the *Thompson* court opined that "pointing guns at persons who are compliant and present no danger is a constitutional violation[,]" it is not clear that Langton likewise presented no danger during his arrest.  885 F.3d at 587.  The *Thompson* plaintiff was stopped while driving at night on suspicion of committing a felony, and he had a prior felony conviction for unlawful

possession of a firearm, was taller and heavier than the arresting officer, and a loaded gun was 10–15 feet away from where the plaintiff was located when an officer allegedly pointed a gun at the plaintiff's head, demanding that he surrender and threatening to kill him if he did not comply. *Id.* at 585–87. The Ninth Circuit found that because the plaintiff had been searched and had no weapon, was not actively resisting arrest, and had complied with law enforcement, a jury could find that the force used against him was excessive in light of the "relatively low" safety threat he posed to the officers. *Id.* at 587.

Langton, however, posed a higher safety threat to the officers during the time that they aimed a firearm at him. The officers knew at that time that, among other things, (1) Langton had access to weapons (and was trained in how to use them) but had not yet been searched; (2) Langton had been drinking alcohol and stopped communicating with those asking him to turn himself in; and (3) Langton had been informed that he was under a criminal investigation, which could potentially end his career. Dkt. No. 25 ¶ 21, Dkt. No. 26 ¶¶ 3, 8. Officers also suspected that Langton was destroying evidence in his backyard fire pit. Dkt. No. 26 ¶ 20. These factors increased Defendants' need to use force in order to safely secure the scene, and distinguish this case from *Thompson*.

Thus, because no reasonable jury could conclude that Langton was subjected to excessive force even when Langton's version of the facts is credited, the Court will enter summary judgment on Langton's Fourth Amendment claim against Deputy Chief Almer.

2.    The City Is Entitled to Summary Judgment on Langton's Claim for Excessive Force.

A municipality can be liable under Section 1983 "when implementation of its official policies or established customs inflicts the constitutional injury." *Monell*, 436 U.S. at 708 (Powell, J., concurring). There are three pathways to municipal liability under Section 1983: (1) the

municipality's official policies or customs inflict the constitutional injury, (2) the municipality's omissions or failures to act suggest an unofficial policy of deliberate indifference to the constitutional rights of others, or (3) a municipal policy-maker commits the constitutional violation or ratifies a subordinate's unconstitutional conduct. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

Langton argues that the City is liable for the excessive force used in his arrest because the City has an "official … policy that pointing a gun at someone so as to view them through a scope is not a use of force" and because the City's policies failed to require "exigent circumstances for a nighttime SWAT search." Dkt. No. 31 at 11–12. But even if the City's policies condoned these challenged actions, because those actions did not violate his constitutional rights (as the Court explained earlier in this order), no liability can attach to the City. *See Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002) (where an individual officer is exonerated on a claim of excessive force, the municipal employer of the officer cannot be held liable for that use of force).

And while a *Monell* claim may survive where there is no individual liability if the alleged constitutional violation results from "*collective* action and not that of the *individual* officers[,]" *Estate of Matus by & through G.M. v. County of Riverside*, No. 5:23-cv-00506-MEMF-SP, 2024 WL 3758011, at *4 (C.D. Cal. Aug. 9, 2024), here, the individual claims duplicate the claims against the City. *See* Dkt. No. 31 at 12 (Langton's opposition brief arguing that the City's liability is based on Deputy Chief Almer's acts). Because Langton was not subjected to unreasonable force during his arrest, neither the individual Defendants nor the City is liable under Section 1983. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.").

## C.     The Assault Claims Are Dismissed.

Police officers can be liable for assault or battery tort claims arising from an arrest only if they use excessive, rather than reasonable, force. *Boyles v. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991), *review denied*, 822 P.2d 288 (Wash. 1991).  Because the Court has found that Langton was not subjected to excessive force during his arrest, Langton's assault claims fail as a matter of law. *See Anderson*, 472 F. App'x at 540.

## D.     The False Arrest and False Imprisonment Claims Fail.

Langton brings false arrest and false imprisonment tort claims against Defendants, contending that he was unlawfully arrested and booked into jail on a misdemeanor charge without a warrant.  Dkt. No. 1 ¶¶ 5.7–5.11.

"The gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority." *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash. 1983).  "The existence of probable cause that a crime has been committed is a complete defense to an action for false arrest and false imprisonment." *Bares v. City of Federal Way*, No. 87055-6-I, 2025 WL 3079827, at *2 (Wash. Ct. App. Nov. 3, 2025).  Probable cause exists where the arresting officer has "knowledge of facts sufficient to cause a reasonable person to believe that an offense had been committed[,]" but "need not have evidence to prove each element of the crime beyond a reasonable doubt." *State v. Gaddy*, 93 P.3d 872, 875 (Wash. 2004).  When probable cause to arrest a suspect for *any* crime exists, that probable cause precludes claims for false arrest and false imprisonment. *See Peterson v. City of Seattle*, No. 49460-1-I, 2003 WL 2232980, at *3–4 (Wash. Ct. App. Oct. 13, 2003).

In this case, before Langton was arrested, two prosecutors and a Superior Court judge agreed that there was probable cause to issue a search warrant for investigation of solicitation of minor and possession of child pornography. Dkt. No. 25 ¶¶ 18–19, Dkt. No. 25-3. At a preliminary

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 15

hearing after Langton's arrest, a Whatcom County deputy prosecuting attorney charged him with attempted child molestation in the second degree, and a Whatcom County Superior Court commissioner found probable cause to support detention. Dkt. Nos. 25-7, 25-9.

Langton argues that Defendants lacked probable cause to arrest him for any crime because Defendants did not have evidence that would satisfy each of the elements of any criminal offense. Dkt. No. 31 at 14–18. This argument fails to appreciate the difference between the evidence needed to support a conviction and the knowledge of sufficient facts necessary to support probable cause. For example, although Langton argues that no probable cause existed with respect to the offense of viewing depictions of minors engaged in sexually explicit conduct (Dkt. No. 31 at 15), this argument is directly contradicted by the text messages that Harp shared with officers. In those messages, Langton referenced one website containing sexual content of "nude young girls" and Langton asked Harp to view the content with him. Dkt. No. 25-2 at 9–10. This evidence is sufficient to support a reasonable inference that Langton had engaged in criminal conduct. *See* WASH. REV. CODE § 9.68A.075 (defining the felony offense of "viewing depictions of a minor engaged in sexually explicit conduct"). Although Langton notes that his messages to Harp were "future-looking" (Dkt. No. 31 at 15), in that they invited her to view the content with him in the future, the context of his messages reasonably suggests that he has visited the website in the past as well. *See* Dkt. No. 25-2 at 9–10. Accordingly, probable cause existed as to the offense of viewing depictions of a minor engaged in sexually explicit conduct, which is a complete defense to Langton's false arrest and false imprisonment claims. *See State v. Gudgell*, 499 P.3d 229, 236 (Wash. Ct. App. 2021) ("It is only the probability of criminal activity, not a prima facie showing of it, that governs probable cause. The [issuing court] is entitled to make reasonable inferences from the facts and circumstances set out in the affidavit." (alteration in original) (quoting *State v. Maddox*, 98 P.3d 1199, 1202 (Wash. 2004))).

Because Langton's false arrest and false imprisonment claims fail as a matter of law for these reasons, the Court will grant Defendants' motion as to these claims.

**E.    The Negligent Investigation Claim Fails.**

Langton's complaint brings a state-law claim for negligent investigation against Defendants. Dkt. No. 1 ¶¶ 5.12–5.15. Langton contends that Lieutenant Cristelli rushed the investigation, failing to take the time necessary to verify the accusations even though no one was in danger. *Id.*

Defendants argue that a negligent investigation claim against a law enforcement officer is not recognized in Washington and therefore must be dismissed. Dkt. No. 22 at 31. Langton disagrees, contending that because the Washington Supreme Court has not explicitly held that such a claim does not exist in Washington, this Court should either find the claim actionable here or certify the question to the Washington Supreme Court. Dkt. No. 31 at 19–20.

On reply, Defendants cite two Washington Supreme Court cases holding that in Washington, a cause of action for negligent investigation exists in Washington only in the context of parents suspected of child abuse. Dkt. No. 38 at 13 (citing *Ducote v. Dep't of Soc. & Health Servs.*, 222 P.3d 785, 787 (Wash. 2009); *M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 960 (Wash. 2003)). Defendants note that the Washington Courts of Appeals have repeatedly rejected an expansion of this cause of action out of the child-abuse context. *See id.* (citing *Janaszak v. State*, 297 P.3d 723, 735 (Wash. Ct. App. 2013) ("We have refused to recognize a cognizable claim for negligent investigation against law enforcement officials and other investigators."); *Fondren v. Klickitat County*, 905 P.2d 928, 934 (Wash. Ct. App. 1995) ("A claim for negligent investigation is not cognizable under Washington law."); *Rogerson v. State*, No. 84646-9-I, 2023 WL 8187594, at *1 (Wash. Ct. App. Nov. 27, 2023) ("Washington courts of appeals have consistently held that negligent investigation by law enforcement is a noncognizable claim. Our Supreme Court has

repeatedly declined invitations to opine differently, thus leaving undisturbed that decisional authority.")).

This prohibition has been recently recognized by this Court as well. *See* Dkt. No. 38 at 14 (citing *Poole v. City of Vancouver*, No. 3:24-cv-5629-DGE, 2025 WL 2880137, at *16 (W.D. Wash. Oct. 9, 2025) ("In general, a claim for negligent investigation does not exist under Washington common law because it prescribes no duty owed to a particular class of persons.")); *Nelson v. Thurston County*, No. 3:24-5548-DGE, 2025 WL 1666271, at *9 (W.D. Wash. June 12, 2025) (explaining that a "claim for negligent investigation by [the police] … is not cognizable under Washington law because it is not a recognized tort and public officials are not liable for actions taken in furtherance of their duties to the public as a whole" (quoting *Hood v. County of King*, 743 F. App'x 79, 83 (9th Cir. 2018)).

Langton cites two Washington Supreme Court cases upholding negligence claims against police officers in other contexts, but neither case finds that a negligent investigation claim against law enforcement is viable in Washington. *See Mancini v. City of Tacoma*, 479 P.3d 656, 659 (Wash. 2021) ("We do not reach the question of whether police may separately be liable for the tort that the parties label 'negligent investigation.'"); *Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 614 (Wash. 2019) (explaining that in Washington, to "establish a duty in tort against a governmental entity, a plaintiff must show that the duty breached was owed to an individual and was not merely a general obligation owed to the public").

Under these circumstances, the Court finds that well-established Washington law prohibits Langton's claim for negligent investigation. Defendants' motion is granted as to this claim and certification to the Washington Supreme Court is unnecessary.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 18

### III.   CONCLUSION

For these reasons, the Court GRANTS Defendants' motion.  Dkt. No. 22.  The Court will enter judgment for Defendants.

Dated this 4th day of May, 2026.

_____
Kymberly K. Evanson
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 19